LAURIE A. KINNEY,                      :
                                       :
          Plaintiff                    :    CIVIL NO. 3:11-CV-1848
                                       :
     vs.                               :    (Judge Conaboy)
                                       :
MICHAEL J. ASTRUE,                     :
COMMISSIONER OF SOCIAL                 :
SECURITY,                              :
                                       :
          Defendant                    :

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Laurie A. Kinney's claim for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Kinney met the insured status requirements of the Social Security Act through December 31, 2008. Tr. 13, 15, 81, 95, 444 and 446.[1] In order to establish entitlement to disability insurance benefits Kinney was required to establish that she

---

1. References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on December 9, 2011.

suffered from a disability on or before that date. 42 U.S.C. §
423(a)(1)(A), (c)(1)(B); 20 C.F.R. § 404.131(a)(2008); see <u>Matullo</u>
<u>v. Bowen</u>, 926 F.2d 240, 244 (3d Cir. 1990).

On April 11, 2008, Kinney protectively filed[2] an
application for disability insurance benefits.[3] Tr. 13, 51, 74-80,
95 and 597.  In her application for disability insurance benefits
Kinney claimed that she became disabled on November 15, 2003. Tr.
74.  However, when interviewed by an officer of the Social
Security Administration she stated that she became unable to work
on November 8, 2003, because of a back injury.[4] Tr. 88.

Kinney's application for disability insurance benefits
was initially denied by the Bureau of Disability Determination[5] on
June 16, 2008. Tr. 53-56.  On June 24, 2008, Kinney requested a

_____

2.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

3.  Kinney previously filed an application for supplemental
security income benefits as well as an application for disability
insurance beneftis.  Those prior applications were denied on
April 17, 2006, and Kinney did not seek administrative review of
the denial of those applications.  Consequently, the relevant
time period is from April 18, 2006, to December 31, 2008,
Kinney's date last insured.

4.  As will be explained in more detail *infra* the record reveals
that on or about November 8, 2003, Kinney suffered a compression
fracture of the L2 vertebral body of the lumbar spine. Tr. 244.

5.  The Bureau of Disability Determination is an agency of the
state which initially evaluates applications for disability
insurance benefits on behalf of the Social Security
Administration.  Tr. 53.

hearing before an administrative law judge. Tr. 57-58. After approximately 12 months had passed, a hearing was held on June 10, 2009, before an administrative law judge. Tr. 32-50 and 616-633. On July 9, 2009, the administrative law judge issued a decision denying Kinney's application for benefits. Tr. 13-20 and 569-576. On July 22, 2009, Kinney filed a request for review of the decision with the Appeals Council of the Social Security Administration. Tr. 7-9 and 584. On November 13, 2009, the Appeals Council concluded that there was no basis upon which to grant Kinney's request for review. Tr. 1-4 and 580-583. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Kinney then filed on January 15, 2010, an action in this court. Kinney v. Astrue, Civil No. 10-00104 (M.D. Pa)(Muir, J.). On July 27, 2010, that case was remanded by Judge Muir to the Commissioner for further proceedings. Tr. 514-565. Judge Muir's opinion in relevant part explained the basis for the remand as follows:

> From our detailed review . . . of the administration law judge's decision and the medical records, it [is] not hard for one to discern the legal and factual errors made by the administrative law judge. At this point we will specify those errors.
>
> First, the administrative law judge at step 2 of the sequential evaluation process found that the only severe impairment was degenerative disc disease and the only other impairment that was medically determinable – status post compression fracture – was a non-severe impairment. However, the medical records reveal that Kinney was diagnosed with several other impairments.

Specifically, she was diagnosed with suffering from foraminal stenosis on the right at the L5-S1 level, facet hypertrophy, sacroiliitis bilaterally, a history of hypertension, and a depressive disorder. Also, the state agency physician, Dr. Potera, after reviewing the medical records concluded that Kinney suffered from right leg radiculopathy.

As noted [previously] all medically determinable impairments, severe and non-severe, are to be considered in the subsequent steps of the sequential evaluation process. The failure of the administrative law judge to find these conditions as medically determinable impairments, or give an adequate explanation for discounting them, makes the subsequent steps of the sequential evaluation process defective.

Second, the administrative law judge as stated earlier concluded that the compression fracture was a non-severe impairment and that it caused no functional limitations. In light of the medical records and the Physical Residual Functional Capacity Assessment form completed by the state agency physician, Dr. Potera, it is hard to discern how the administrative law judge came to the conclusion that the compression fracture was a non-severe impairment. A severe impairment as explained . . . is an impairment that significantly limits an individual's ability to perform basic work activities such as walking, standing, sitting and pushing. An impairment is non-severe when medical and other evidence established only a slight abnormality that would have no more than a minimal effect on an individual's ability to work. Dr. Potera determined that Kinney's primary diagnosis was a compression fracture at the L2 level and based on that primary diagnosis Dr. Potera significantly limited her to less than the full range of work. Tr. 436-440. Absent from the administrative record is a statement by a medical professional that the compression fracture had no more than a minimal effect on Kinney's ability to work. The conclusion that the compression fracture was not a severe impairment is not supported by substantial evidence.

Third, the failure to address the issue of whether or not Kinney suffered from foraminal stenosis on the right at the L5-S1 level, facet hypertrophy, sacroiliitis bilaterally, a history of hypertension, a depressive disorder and right leg radiculopathy does not only call

4

into question the administrative law judge's residual functional capacity determination but it also calls into question the administrative law judge's assessment of Kinney's credibility. The administrative law judge concluded that Kinney's statements concerning the intensity, persistence and limiting effects of her pain were not credible. This finding is suspect because the administrative law judge did not make a determination as to whether or not Kinney suffered from the above conditions. It is also suspect because the administrative law judge concluded that the compression fracture was a non-severe impairment causing no functional limitations.

Fourth, the administrative law judge used inappropriate boilerplate language in assessing Kinney's credibility and we will repeat some of that language. The administrative law judge at page 6 of her decision stated as follows:

> Generally, when an individual has suffered pain over an extended period of time, there will be observable signs such as a **significant loss of weight, an altered gait or limitation of motion, local morbid changes,** or poor coloring or station. In the present case, the claimant has complained of pain over an extended period of time. **None of the above signs of chronic pain is evident.** While not conclusory by itself, this factor contributes to the determination that the claimant is not disabled as a result of pain.

Tr. 18 (emphasis added). The medical records, as detailed in this order, reveal where examining physicians noted an altered gait, local morbid changes (muscle atrophy), loss of weight and limitation of range of motion. The administrative law judge's finding that the medical records contain no evidence of a significant weight loss, an altered gait, limitation of motion, or local morbid changes is clearly erroneous.

Finally, Kinney was unrepresented at the administrative hearing. That hearing lasted 23 minutes. There was no attempt by the administrative law judge to obtain an assessment from Kinney's treating physicians regarding Kinney's functional capacity. The administrative law judge had a responsibility to investigate the facts and develop the arguments both for and against granting

> benefits.  In this case she did not fulfill that
> responsibility

Kinney v. Astrue, Civil No. 10-00104, slip op. at 48-52 (M.D.Pa. July 27, 2010)(Muir, J.)(Doc. 11).

A second hearing before the same administrative law judge was held on January 25, 2011. Tr. 495-512.  On June 6, 2011, 2011, the administrative law judge issued a decision denying Kinney's application. Tr. 444-456.  Where a case is on remand from a Federal District Court, the decision of the ALJ becomes the final decision of the Commissioner 61 days after it is rendered and notice given to the claimant of the ALJ's decision, if no exceptions are filed with the Appeals Council and the Appeals Council does not review the decision on its own. Tr. 442.  No exceptions were filed and the Appeals Council did not review the decision of the ALJ on its own.

Kinney then filed a timely complaint in this court on October 6, 2011.  Supporting and opposing briefs were submitted and the appeal[6] became ripe for disposition on April 9, 2012, when Kinney elected not to file a reply brief.

Kinney was born in the United States on March 15, 1964. Tr. 37, 51, 74, 81, 95, and 168, 589, 594, 597 and 621.  She

---

6.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

graduated from high school in 1982, can read, write, understand and speak English and perform basic mathematical functions. Tr. 38, 46, 87, 93 and 622. During her elementary and secondary schooling, Kinney attended regular education classes. Tr. 93. After high school, Kinney did not complete "any type of special job training, trade or vocational school." Id.

Kinney has past relevant work experience[7] as a convenience store clerk which was described by a vocational expert as unskilled, light work, and as a waitress described as semi-skilled, light work.[8] Tr. 46, 82-86 and 89. In documents filed

---

7. Past relevant employment in the present case means work performed during the 15 years prior to the date the Commissioner adjudicated Kinney's case. 20 C.F.R. §§ 404.1560 and 404.1565.

8. The terms sedentary, light and medium work are defined in the Social Security regulations as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the

(continued...)

with the Social Security Administration Kinney stated that her work as a convenience store clerk and waitress occurred from 1990 to 2003 and that she worked 4 hours per day, 5 days per week. Tr. 89, 110 and 112. The job she performed the longest according to her statement was the waitress position and the heaviest items lifted weighed 50 pounds and she frequently lifted 10 pound items. Tr. 89.

Although Kinney's work history spans 21 years, she has a relatively low earnings history with an average yearly income of $2962.80. Records from the Social Security Administration reveal that Kinney had earnings in the years 1983, 1984, 1987, and 1990 through 2003 as follows:

| | |
|---|---|
| 1983 | $ 2906.58 |
| 1984 | 1354.24 |
| 1987 | 178.22 |
| 1990 | 1005.27 |
| 1991 | 484.66 |
| 1992 | 1015.00 |
| 1993 | 524.62 |

---

8. (...continued)
        ability to do substantially all of these activities.
        If someone can do light work, we determine that he or
        she can also do sedentary work, unless there are
        additional limiting factors such as loss of fine
        dexterity or inability to sit for long periods of time.

        (c) *Medium work*. Medium work involves lifting no more
        than 50 pounds at a time with frequent lifting or
        carrying of objects weighing up to 25 pounds. If
        someone can do medium work, we determine that he or she
        can do sedentary and light work.

20 C.F.R. § 404.1567.

| | |
|---|---|
| 1994 | 878.50 |
| 1995 | 1548.75 |
| 1996 | 230.00 |
| 1997 | 5162.93 |
| 1998 | 6987.26 |
| 1999 | 10398.61 |
| 2000 | 9497.88 |
| 2001 | 8978.42 |
| 2002 | 5954.37 |
| 2003 | 5113.44 |

Tr. 82 and 613. Kinney's total earnings during those years were $62,218.75. Tr. 613. Kinney had no earnings in the years 1985, 1986, 1988, 1989 and has had no earnings since 2003.

For the reasons set forth below we will remand the case to the Commissioner for further proceedings.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported

by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and

"must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record. <u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 557 (3d Cir. 2005); <u>Fraction v. Bowen</u>, 787 F.2d 451, 454 (8th Cir. 1986); <u>Reed v. Massanari</u>, 270 F.3d 838, 841 (9th Cir. 2001); <u>Smith v. Apfel</u>, 231 F.3d 433. 437 (7th Cir. 2000); <u>see also</u> <u>Sims v. Apfel</u>, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting

benefits[.]").  If the record is not adequately developed, remand for further proceedings is appropriate. Id.

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating claims for disability insurance benefits.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a

12

claimant (1) is engaging in substantial gainful activity,[9] (2) has

an impairment that is severe or a combination of impairments that

is severe,[10] (3) has an impairment or combination of impairments

that meets or equals the requirements of a listed impairment,[11]

(4) has the residual functional capacity to return to his or her

past work and (5) if not, whether he or she can perform other work

in the national economy. Id. As part of step four the

---

9. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

10. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

11. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

administrative law judge must determine the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Kinney's medical records. The medical records contained within the administrative record span the time period of January 1, 2003, through March 17, 2011. Because the relevant time frame is from April 18, 2006 (the date after her prior applications for

---

12. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

supplemental security income benefits and for disability insurance benefits were denied) through the date last insured (December 31, 2008), the medical records prior to and after those dates have limited relevance other than to show the nature of her medical condition for historical purposes.

The first medical record we encounter in the administrative record is from January 1, 2003. Tr. 130-133.  That medical record reveals that Kinney had an appointment at the Williamsport Hospital & Medical Center, Urgicenter,[13] for IV antibiotic treatment for an acute dental abscess.  Tr. 131-132. Kinney returned to the Urgicenter on January 2, 2003, for a "recheck" of her IV antibiotic treatment.  Tr. 134-137. Kinney was given Percocet for severe pain, instructed to continue with the antibiotic and follow-up with her family physician if she did not improve. Tr. 137.  The record reveals that Kinney repeatedly sought treatment for dental problems at the Emergency Department of the Williamsport Hospital.[14]

---

13.  The Emergency Department at the Williamsport Hospital was divided into two separate treatment areas: (1) Emergency and (2) Urgicenter.  The Urgicenter was for patients with less critical medical conditions. When Kinney visited the Urgicenter in contrast to the emergency treatment area, we will so indicate.

14.  We will not review in this memorandum the numerous records of Kinney seeking such treatment but refer the reader to Judge Muir's memorandum.

On February 11, 2003, Kinney visited the Williamsport Hospital complaining of chest pressure and pain which had lasted 5 days. Tr. 138-145. She was admitted to the hospital on that date and discharged on February 12, 2003. Tr. 138. The treating physician, James R. Owens, M.D., stated in a report of the encounter as follows:

> This is a 38-year-old female . . . who presents with chest pain to sharp intensity with radiation to the left jaw with pain originating at the upper sternum x 5 days starting on Friday. This pain was intermittent at first lasting only a few minutes with waxing and waning presentation. Yesterday the chest pain became chest pressure with chest tightness all throughout. The patient had dyspnea on exertion but shortness of breath when sitting or lying. Denies nausea, vomiting or diaphoresis. Does have some palpitations with pain and increased blood pressure which the patient is able to "feel." Last evening the patient had a two pillow orthopnea with the patient feeling better in the upright position . . . No history of previous chest pain episodes. . . In the emergency room the pain decreased to 4 out of 10 after one sublingual Nitroglycerin . . . .

Tr. 138. Kinney's blood pressure initially was 151/104 but subsequently decreased to 125/82. Tr. 140. Dr. Owens noted a history of degenerative joint disease in the hips, back and left knee secondary to a motor vehicle accident. Tr. 139. Dr. Owens ordered blood tests and gave a differential diagnosis,[15] including

---

15. "Differential diagnosis" is "[t]he process of weighing the probability of one disease versus that of other diseases possibly accounting for a patient's illness." http://www.medterms. com/script/main/art.asp?articlekey=2991 (Last accessed March 4,
(continued...)

myocardial infarction, unstable angina, gastroesophageal reflux disease and esophageal spasm. Tr. 140. Kinney was also found to have an elevated blood sugar. Tr. 141.

On February 23, 2003, Kinney visited the Emergency Department at the Williamsport Hospital complaining of low back pain resulting from an injury at work. Tr. 146-150. The diagnosis was musculoligamentous[16] low back pain. Tr. 147. Kinney was directed to take several pain medications and have bed rest for 1-2 days. Tr. 150. She was discharged from the hospital in stable condition and given an excuse from work for February 24 and 25, 2003. Tr. 148-150.

On March 11, 2003, Kinney visited the Emergency Department at the Williamsport Hospital complaining of chest tightness. Tr. 151-154. Her blood pressure was 160/100. Tr. 153. The record of this visit indicates that she left the hospital without seeing a physician but that she "has ap[poin]t[ment] [with] [primary] MD tomorrow." Tr. 153. Kinney's primary care physician noted on the record was Jay K. Miller, M.D. Tr. 151.

On April 30, 2003, Kinney visited the Urgicenter at the Williamsport Hospital complaining of low back pain. Tr. 155-160.

---

15. (...continued)
2013).

16. This is medical term for describing a back strain or sprain.

The record of this visit indicates that she had flu like symptoms for three days but that those symptoms had generally resolved. Tr. 159. She still, however, had pain throughout the lumbar area which according to her was consistent with her chronic back pain. Id. She claimed that she had bulging discs without a "radicular component" or "loss of bowel or bladder function." Id. The physical examination revealed that her blood pressure was 155/99 and she "was palpably tender throughout the paraspinal musculature of the lumbar region, prominently left side and extending into the gluteal musculature." Id. Kinney was prescribed pain medications and instructed to use warm compresses, do mild stretching, and follow-up with her primary care physician, Dr. Miller. Tr. 160. She was also given a note excusing her from work. Id.

On May 13, 2003, Kinney visited the Emergency Department at the Williamsport Hospital complaining of a severe migraine headache. Tr. 161-167. Kinney rated her pain as a 10 on a scale of 1 to 10. The pain was on the right side above the right eye and throbbing in nature. The headache was accompanied by nausea. The physical examination revealed that her blood pressure was 150/102. She was very photophobic, tender on both temples and both sides of the neck "seemed to be quite tense." Tr. 163. The examining physician, Maher Alhashimi, M.D., was unable to see the fundus of the eye. Id. Dr. Alhashimi administered various

18

medications which seemed to relieve her headache and brought her blood pressure down to 120/80. Tr. 164. Dr. Alhashimi prescribed a combination of drugs - Midrin, Reglan and Klonopin – and she was discharged from the hospital on May 14, 2003, with instructions to follow-up with her primary care physician, Dr. Miller. Id.

On July 2, 2003, Kinney visited the Emergency Department at the Williamsport Hospital complaining of heavy vaginal bleeding and back pain. Tr. 174-179. Her blood pressure was 139/94. Tr. 178. Blood tests were ordered and the results were unremarkable. Tr. 177. The diagnosis was "heavy vaginal bleeding, etiology uncertain." Id. The treating physician Gerhard C. Senula, M.D., talked to her about having an ultrasound examination and she was given a prescription for Provera and instructed to follow-up with Dr. Miller. Id.

On August 22, 2003, Kinney visited the Urgicenter at the Williamsport Hospital complaining of neck pain. Tr. 180-186. Her blood pressure was 147/96. Tr. 184. She was diagnosed as suffering from an acute myofascial strain, given pain medications, discharged and told to follow-up with her primary care physician, Dr. Miller. Tr. 185.

On November 8, 2003, Kinney visited the Williamsport Hospital. Tr. 215-219. On that date which corresponds with Kinney's alleged disability onset date, Kinney had an altercation

with her spouse and suffered a back injury.  The records suggest that both Kinney and her husband were consuming alcohol. Tr. 216 Kinney was pushed into a wall resulting in pain to her lumbar and sacral regions. Tr. 217.  She was transported to the Williamsport Hospital by ambulance. Tr. 215.  Kinney's condition was monitored, she was given pain medications (Toradol and Nubain), and after several hours was discharged with instructions to apply ice to the affected regions and fill a prescription for Percocet, a pain medication. Tr. 218-219.  There is no indication that radiographs were taken of her lower back on November 8, 2003.

On November 10, 2003, Kinney returned to the Williamsport Hospital complaining of severe back pain. Tr. 220-225. Radiographs of her lumbar spine were taken and revealed a compression fracture of the L2 vertebra. Tr. 222.  Dr. Senula's diagnosis was as follows: "L2 compression fracture with mild retropulsion of bony fragments." Id.[17]  A report of this

17.  The pathophysiology of a compression fracture has been described in an article by Andrew L. Sherman, M.D.,M.S., as follows:

> The lumbar spine provides both stability and support, allowing humans to walk upright. Proper function of the lumbar spine requires that it have a normal posture (ie, a normal lumbar curve). Any injury that changes the shape of a lumbar vertebra will alter the lumbar posture, increasing or decreasing the lumbar curve. As the body attempts to compensate for the alteration in the lumbar spine in order to maintain an upright
>
> (continued...)

17.  (...continued)
          posture, this will tend to distort the curves of the
          thoracic and cervical spine.

          Lumbar compression fractures can be a devastating
          injury, therefore, for 2 reasons. First, the fracture
          itself can cause significant pain, and this pain
          sometimes does not resolve. Second, the fracture can
          alter the mechanics of the posture. Most often, the
          result is an increase in thoracic kyphosis, sometimes
          to the point that the patient cannot stand upright. In
          trying to maintain their ability to walk, patients with
          kyphosis report secondary pain in their hips,
          sacroiliac joints, and spinal joints. These patients
          are also at risk for falls and accidents, increasing
          the risk of secondary fractures in the spine and
          elsewhere.

          Fractures in the lumbar spine occur for a number of
          reasons. In younger patients, fractures are usually due
          to violent trauma. Car accidents frequently cause
          flexion and flexion distraction injuries. Jumps or
          falls from heights cause burst fractures. These
          fractures can also result in serious neurological
          injury. In older patients, lumbar compression fractures
          usually occur in the absence of trauma, or in the
          context of minor trauma, such as a fall. The most
          common underlying reason for these fractures in
          geriatric patients, especially women, is osteoporosis.
          Other disorders that can contribute to the occurrence
          of compression fractures include malignancy,
          infections, and renal disease.

http://emedicine.medscape.com/article/309615-overview (Last
accessed March 4, 2013). According to Thomas A. Zdeblick, M.D.,
Professor and Chairman, Orthopaedic Surgery, University of
Wisconsin, "[w]edge fractures are considered serious when the
fracture affects adjacent vertebrae, anterior wedging is 50%,
severe hyperkyphosis (bent forward) is present, or bone
fragment(s) are suspect in the spinal canal."  http://www.
spineuniverse.com/conditions/osteoporosis/vertebral-wedge-fract
ure (Last accessed March 4, 2013).  "Kyphosis is a curving of
the spine that causes a bowing of the back, which leads to a
                                              (continued...)

visit was also prepared by Hani J. Tuffaha, M.D., which states in

pertinent part as follows:

> This is a 39-year-old Caucasian female who was
> reportedly pushed by her husband and fell to the
> floor on 11/8/03.  The husband was apparently
> drinking prior to that.  She was evaluated in the
> emergency room on that date and was complaining of
> low back pain with no weakness, radicular pain or
> numbness.  She was treated symptomatically and
> discharged.  She returned to the emergency room
> on 11/10/03 complaining of severe low back pain
> especially with movement and change of position.
> She stated that Percocet and Motrin gave her
> temporary partial relief.  She reported that
> when she stands she "loses urine." . . . She
> continues to be free of any radicular type of pain
> or numbness in her lower extremities.  She is
> unaware of focal weaknesses in her lower extremities.
> She denies any mid or upper back pain or any neck
> pain.[18]

>    *    *    *    *    *    *    *    *    *    *    *

> Of significance is a history of chronic, intractable
> low back pain syndrome attributed to an auto accident
> a couple years ago.

>    *    *    *    *    *    *    *    *    *    *    *

> Examination of her lower back after I turned her on
> her side partially revealed some tenderness in the mid
> and upper lumbar region.  There is some paravertebral
> muscle stiffness.  Her straight-leg raising is unlimited
> to 75 degrees bilaterally at which point it resulted in

---

17.  (...continued)
hunchback or slouching posture." Kyphosis, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/ency/article/001240.htm
(Last accessed March 4, 2013).

18.  It is worth noting that at the time of the examination,
Kinney was medicated with Toradol and morphine sulfate.

increased low back pain but no leg pain.[19]  There is
some pain with internal and external rotation of the
hips. The femoral nerve stretching test is moderately
painful bilaterally.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Her lumbar spine x-rays were reviewed along with a
lumbar CT scan.  There is evidence of a compression
fracture of L2 with mild impingement on the spinal
canal from the posterior aspect of L2 compression.
The pedicles, facets, laminae and spinous process are
intact.  There is no angulation of (sic) malalignment.

IMPRESSION:  Compression fracture of L2 with no
significant compression of the cauda equina.[20]  The
patient has severe low back pain with no radiculopathy.
It is not clear at this time why she becomes
incontinent of urine during standing.

Tr. 223-224.  Dr. Tuffaha noted that he doubted she would need

surgical intervention and gave her a prescription for Hydrocodone

as well as a lumbar support. Tr. 225.  He further ordered an MRI

of the lumbar spine. Id.

---

19.  The straight leg raise test is done to determine whether a
patient with low back pain has an underlying herniated disc.  The
patient, either lying or sitting with the knee straight, has his
or her leg lifted.  The test is positive if pain is produced
between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing
for Herniated Discs: Straight Leg Raise, SpineUniverse,
http://www.spineuniverse.com/experts/testing-herniated
-discs-straight-leg-raise (Last accessed March 4, 2013).

20.  The "cauda equina" is "the collection of spinal roots that
descend from the lower part of the spinal cord and are located
within the lumbar cistern of the caudal dural sac; their
appearance resembles the tail of a horse."  See Dorland's
Illustrated Medical Dictionary, 308 (32nd Ed. 2012).

The report of the x-rays taken on November 10, 2003, states in pertinent part as follows: "[E]xamination reveals moderate superior plate and anterior L2 compression fracture deformity . . . There appears to be some fragment retropulsion off the posterior L2 vertebral body encroaching the spinal canal." Tr. 226. The report of the CT scan taken on November 10, 2003, states in pertinent part as follows: "There is a comminuted[21] compression fracture through only the body of L2." Tr. 227.

On November 19, 2003, an MRI of Kinney's lumbar spine was taken. Tr. 243-244 and 361. The report of that MRI conflicts with Dr. Tuffaha's earlier assessment of the fracture to the extent that the MRI revealed angulation of the lumbar spine at the L2 level. That report states in relevant part as follows:

> There is a moderate sized wedge shaped compression fracture of the L2 vertebral body . . . This results in bulging of the posterosuperior aspect of the L2 vertebral body into the spinal canal **as well as angulation of the lumbar spine at this level**. No free fragment is seen. At the L1-2 disc level, no disc herniation is seen.
>
> \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*
>
> Sections through the L4-5 disc level demonstrate disc bulging with a super-imposed right neural foraminal disc protrusion.
>
> \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

---

21. A comminuted fracture is a fracture in which the bone is broken, splintered or crushed into a number of pieces.

> There is evidence of degenerative disc change at the
> L4-5 and L5-S1 disc levels.  At the L5-S1 disc level,
> there is diffuse disc bulging with a super-imposed right
> neural foraminal disc protrusion with associated
> osteophyte[22] formation, which result in neural foraminal
> narrowing.[23]

Tr. 243-244 (emphasis added).

On December 5, 2003, Kinney had another appointment with Dr. Tuffaha. Tr. 242.  In a report of that visit Dr. Tuffaha stated that Kinney complained of severe mid and low back pain but no radicular pain.  Kinney described "jerking" in the legs at night and urinary incontinence or urgency when she stands. Id. She further reported increased pain at night.  The physical examination revealed that she ambulated with crutches and had marked restriction of range of motion at the waist. Id.[24]  Dr. Tuffaha's impression was as follows: "Healing superior compression fracture of L2 with no neurological deficits." Id.

On February 20, 2004, Kinney had an appointment with Dr. Tuffaha.  Tr. 241.  In a report of that visit Dr. Tuffaha stated that Kinney

---

22.  An osteophyte is a bony growth or spur.  See Dorland's Illustrated Medical Dictionary, 1348 (32nd Ed. 2012).

23.  "Neural foraminal" refers to the space or opening in the vertebra where a nerve passes out from the spinal cord.

24.  The medical record of this appointment does state that she was wearing a simple lumbar corset with no metal stays in the front but it is not clear whether she removed the corset prior to the physical examination by Dr. Tuffaha.

> continues to be symptomatic with low back pain, which
> is particularly bothersome with prolonged sitting and
> lying down.  She is able to walk for fifteen minutes.
> She remains free of radicular pain, but describes
> "shakiness" in the legs at times.  She is using a
> pair of crutches since she does not have a walker
> or cane.  She is taking Lortab 7.5, four times per
> day.[25]
>
> On examination, there is tenderness over the lumbar
> spine with dramatic painful response. . . .

Id.  Dr. Tuffaha goes on to state that x-rays of February 20,

2004, reveal a "healing" compression fracture and then in the

impression section of his report refers to a "healed" compression

fracture with lingering low back pain.  Id.  Dr. Tuffaha

recommended to Kinney the option of surgical fusion to alleviate

her back pain.  Id.

X-rays were taken on February 20, 2004.  Tr. 246.  The

report of those x-rays do not refer to a "healed" compression

fracture.  That report states as follows:

> Lateral view of the lumbar spine were obtained in
> neutral, flexion, and extension.  There is at least
> a 50% anterior wedge compression[26] fracture of L2 with
> associated compression of the superior cortical plate
> of L2.  There are several millimeters of posterior
> displacement of L2 at the L1-2 level.  There is no
> motion at the L1-2 level between flexion and extension.
> The motion occurs at other disc spaces.

---

25.  Lortab 7.5 is a pain medication consisting of a combination
of acetaminophen and hydrocodone.

26.  See footnote 17, *supra*, explaining that wedge fractures can
be serious when the anterior wedging is 50%.

> IMPRESSION: Moderate compression fracture of L2. The
> degree of compression fracture has increased only
> minimally since the films from 11/10/03 but the degree
> of localized kyphosis at that area has increased
> somewhat. No other changes have occurred.

Id.

On April 25, 2004, Kinney visited the Emergency
Department at the Williamsport Hospital complaining of severe back
pain. Tr. 260-265. Her blood pressure was 154/105. Tr. 264. She
was given pain medications, monitored for several hours and
discharged after her pain subsided. Id. She was instructed to
follow-up with Dr. Tuffaha. Tr. 265.

On June 23, 2004, Kinney visited the Emergency
Department at the Williamsport Hospital complaining of low and mid
back pain. Tr. 260-265. Her blood pressure was 126/92. Tr. 270.
She was given pain medications, monitored for approximately an
hour and discharged after she stated she was feeling better. Tr.
270 and 273. She was instructed to follow-up with Dr. Tuffaha.
Tr. 271.

Also, on June 23, 2004, radiographs of Kinney's lumbar
spine were taken. Tr. 245 and 274. The report of those
radiographs states in relevant part as follows:

> There is an anterior wedging of the L2 vertebral
> body. The vertebra is decreased in height anteriorly
> by 50% relative to the posterior vertebral body margin
> which remains normal in height. The compression
> fracture has not progressed during the interval studies.
> There is minimal fragmental displacement anteriorly,

> although no change since the prior study. The superior
> endplate of L2 is increasing in density suggesting
> bone healing. As would be expected, there is localized
> kyphosis at the L1-2 level.
> Flexion and extension films show no translation of the
> lumbar vertebra in the AP direction. There is mild
> disc space narrowing at the L5-S1
> IMPRESSION: 1. Stable compression fracture of L2.
> 2. No abnormal vertebral motion within the lumbar
> spine with flexion or extension.

Tr. 274.

On July 23, 2004, Kinney was examined by Arun Kalyanasundaram, M.D., at the Geisinger Medical Center, Danville, Pennsylvania. Tr. 377-378. The report of that visit prepared by Dr. Kalyanasundaram states in part as follows:

> Dr. Tuffaha from Williamsport was taking care of her
> back injury. Primarily, her pain medications were being
> taken care of by him. He had recommended surgery.
> . . . Pain has been getting worse. Apparently, Dr.
> Tuffaha did not continue to follow her 2 months earlier
> secondary to her wanting a second opinion. Since then,
> has been going from ER to ER for pain meds. Seen in our
> ER and then referred here for a PCP.[27] States that her
> legs have been shaking after standing for 10 minutes.
> No bowel problems. States that she has been having
> some urinary incontinence that has improved. No
> numbness or tingling down her legs.
>
> *   *   *   *   *   *   *   *   *   *   *

Tr. 377. Dr. Kalyanasundaram's physical examination of Kinney revealed that her weight was 183 pounds, and she had lower back tenderness and pain on flexion. Tr. 378. Dr. Kalyanasundaram stated that Kinney "needs crutches secondary to pain." Id. His

---

27. "PCP" is an abbreviation for primary care physician.

assessment was that Kinney was suffering from a wedge fracture of the L2 vertebra and he started her on methadone for long term pain relief. Id.

On July 26, 2004, Kinney had an MRI of the lumbar spine which revealed the following:

> [A] compression fracture of L2 with wedge deformity and a <u>burst component</u>.[28] There is a retropulsed fragment but no spinal cord or nerve root compression at this level. There is resultant mild kyphotic deformity centered on this level.
>
> There is narrowing of the neural foramen on the right at L5-S1.
> There is a small left paracentral disk protrusion at L5-S1.
> There is a disk bulge and a small central protrusion at L4-L5.

Tr. 428 (emphasis added).

On August 9, 2004, Kinney had an appointment with Dr. Kalyanasundaram. Tr. 379. Dr. Kalyanasundaram noted that Kinney's back pain had "improved on the methadone" and that she "[t]akes 1 percocet daily." Id. Kinney's physical examination was essentially normal other than a slightly elevated blood pressure. Id. Her weight was 183 pounds. Id.

On October 1, 2004, Kinney visited the Urgicenter at the Williamsport Hospital complaining of severe sharp and burning low back pain which radiated to her legs. Tr. 306-312. Kinney was

---

28. See footnote 30, *infra*.

diagnosed with chronic low back pain and a lumbar compression fracture. Tr. 309. It was noted that she was recently treated at Geisinger Medical Center and she was discharged with instructions to follow-up at that facility. Tr. 308 and 312. At the time of her discharge her condition was unchanged. Tr. 311. This appears to be the first time Kinney reported radicular symptoms, that is, radiating pain to the lower extremities.

On October 7, 2004, Kinney had an appointment with David Andreyesik, M.D., at the Geisinger Medical Center. Tr. 381. The report of that visit states in part that Kinney "[r]ecently had a history of radiating pain to the right lower extremity to the level of the right foot. This has been ongoing for the past three weeks . . . The radiating right lower extremity pain which occurred three weeks ago was after an encounter, <u>when being thrown against a wall</u>. . . She is currently using medications without significant relief. . . She is here today for an evaluation." <u>Id.</u> (emphasis added).[29] The physical examination of Kinney was essentially normal other than having "[p]ositive pain on palpation in the mid and lower back areas." <u>Id.</u> X-rays were performed which revealed an "L2 burst fracture." <u>Id.</u>[30] Dr. Andreyesik noted that

_____

29. This appears to be an additional trauma to Kinney's spine after the alleged disability onset date of November 8, 2003.

30. Thomas A. Zdeblick, M.D., Professor and Chairman,

(continued...)

"[a]n MRI from November of 2003 also revealed an L2 burst fracture." Id.  Dr. Andreyesik's assessment was that Kinney was suffering from an L2 burst fracture and ordered a new MRI. Id.

On November 3, 2004, Kinney visited the Urgicenter at the Williamsport Hospital complaining of severe back pain of a burning sharp nature and radiating to the legs. Tr. 315.  The physical examination record states that Kinney was in moderate to

---

30.  (...continued)
Orthopaedic Surgery, University of Wisconsin, describes a burst fracture as follows:

> A burst fracture is a descriptive term for an injury to the spine in which the vertebral body is severely compressed. They typically occur from severe trauma, such as a motor vehicle accident or a fall from a height. With a great deal of force vertically onto the spine, a vertebra may be crushed.
>
> If it is only crushed in the front part of the spine, it becomes wedge shaped and is called a compression fracture. However, if the vertebral body is crushed in all directions it is called a burst fracture. The term burst implies that the margins of the vertebral body spread out in all directions. This is a much more severe injury than a compression fracture for two reasons. With the bony margins spreading out in all directions the spinal cord is liable to be injured. The bony fragment that is spread out toward the spinal cord can bruise the spinal cord causing paralysis or partial neurologic injury.

Thomas A. Zdeblick, M.D., Burst Fractures: Defined and Diagnosed, SpineUniverse, http://www.spineuniverse.com/conditions/spinal-fractures/burst-fractures-defined-diagnosed (Last accessed March 4, 2013).

severe distress. Tr. 316. She had decreased range of motion in the back, muscle spasm and vertebral point-tenderness. Id. Kinney was discharged with instruction to take certain medications and follow-up with her physician at Geisinger Medical Center. Tr. 319.

On November 15, 2004, Kinney had an appointment with Dr. Kalyanasundaram at Geisinger Medical Center. Tr. 382. Kinney reported that she still had back pain and it might have gotten worse. Id. She also stated that she had "radicular symptoms if she walked a lot." Id. The physical examination revealed a weight of 181 pounds, tenderness in the mid and lower back areas, and a positive straight leg raising test at about 45 degrees. Id. Because of insurance problems an MRI had not been performed and one was again ordered. Id.

On April 8, 2005, Kinney had an appointment with Dr. Kalyanasundaram at the Geisinger Medical Center. Tr. 383. Kinney was depressed at this appointment. Id. She stated that back pain might have gotten worse and she still was having radicular symptoms. Id. A physical examination revealed that she weighed 174 pounds, she had tenderness in the mid and lower back areas, and she had a positive straight leg raising test at 45 degrees. Id. Dr. Kalyanasundaram gave her a prescription for the pain medication Percocet and the antidepressant Celexa. Id.

On July 22, 2005, Kinney had an appointment with Juan C. Salgado Campo, M.D., at Geisinger Medical Center. Tr. 384-386. Dr. Salgado Campo's report of this appointment notes Kinney's worsening radicular symptoms, the recent start of an antidepressant and the failure to obtain an MRI because of insurance issues. Tr. 384. He further noted that Kinney now has insurance and, therefore, he reordered an MRI. Tr. 386. Dr. Salgado Campo's physical examination of Kinney revealed that she had lost weight. Tr. 385. She weighed 166 pounds. The physical examination further revealed a positive straight leg raising test at 30 degrees. Id. Kinney was diagnosed with a vertebral fracture and a depressive disorder. Tr. 386.

On September 28, 2005, Kinney had an appointment with Patricia A. Sanchez, M.D., at Geisinger Medical Center. Tr. 387-388. At that appointment Kinney weighed 166 pounds, she had mild to moderate spasm of paralumbar muscles, she had some limitation of flexion, a positive straight leg raising test of the left lower extremity at 45 degrees, bilateral muscle atrophy of the legs, and bilateral muscular weakness of the legs. Tr. 387. Dr. Sanchez's assessment was that Kinney was suffering from chronic lumbar pain as the result of a lumbar fracture and disk compression. Id.

On October 28, 2005, Kinney visited the Emergency Department at Williamsport Hospital complaining of bilateral leg

spasm. Tr. 353-360.  Kinney apparently became impatient and left before she could be seen by a physician. Id.

On December 20, 2005, Kinney had an appointment with Dr. Salgado Campo at the Geisinger Medical Center regarding her chronic pain. Tr. 389.  The physical examination revealed that Kinney weighed 169 pounds, she had a positive straight leg raising test and she walked with crutches. Id.  The diagnoses was vertebral wedge fracture and chronic back pain. Id.  Dr. Salgado Campo completed a disability sticker form for her motor vehicle. Id.

On January 16, 2006, Kinney had an appointment with Shaik Mohd L. Ahmed, M.D., at Geisinger Medical Center, Interventional Pain Center. Tr. 390-392.  Kinney complained of pain in the distal thoracic, the low back with radiation to the buttocks and occasional radiation of pain to the right posterior thigh and calf. Tr. 390.  The physical examination revealed that Kinney's gait was slow and antalgic, her flexion of the back was reduced 50 degrees and causes low back pain, her extension and rotation of the back produced low back pain, she had a positive bilateral straight leg raising test and a positive bilateral Patrick's maneuver, and her sacroiliac joint was tender. Tr. 392. Dr. Ahmed's assessment was that Kinney was suffering from an L2 compression fracture, facet syndrome, foraminal stenosis on the

right at the L5-S1 levels, facet hypertrophy, lumbago, degenerative disc disease, and sacroilitis bilaterally. Id. His plan was to attempt facet joint injections to alleviate the pain.[31] Id.

On March 10, 2006, Kinney had an appointment at the Geisinger Medical Center regarding an abscess in the vulvar area. Tr. 393-394. The physical examination revealed that she weighed 160 pounds and her blood pressure was 158/94. Tr. 394. She was treated with antibiotics.

On March 13, 2006, Kinney had an appointment with Dr. Ahmed at the Interventional Pain Center and a lumbar facet block injection (steroid injection) was administered. Tr. 395-396. She had significant relief of pain after this procedure and a follow-up visit was scheduled for one month from the date of the injection. Tr. 396.

On April 28, 2006, Kinney had an appointment with Dr. Salgado Campo at Geisinger Medical Center. Tr. 397-398. At that appointment Kinney weighed 153 pounds and she had a positive straight leg raising test. Tr. 397.

---

31. Kinney was referred to Dr. Ahmed by Dr. Salgado Campo for a consultative examination. Dr. Ahmed's report of this consultation included a section entitled "History of Present Illness" and a section entitled "Physical Exam."

Additional steroid injections were administered on July 12 and October 31, 2006, and February 26, June 20, and September 25, 2007, resulting in temporary relief of pain. Tr. 399-400, 406-407, 409-411, and 415. At the appointment on February 26, 2007, it was observed that Kinney had multiple "pox" marks on her face, arms and legs with no active drainage and that she had increased pain with range of motion of the lumbar spine and palpation of the lumbar facets. Tr. 410. At the appointment on June 20, 2007, it was noted that Kinney continued with severe lumbago but also was having some right L5-S1 radiculopathy. Tr. 411.

On July 12, 2006, an MRI revealed that Kinney had a "chronic anterior wedging of L2 vertebral body with a burst component without significant canal narrowing." Tr. 430. It further revealed "some degenerative disc desiccation and generalized disc bulging at L4-L5 and L5-S1. Small posterior central disc protrusion is present at L4-L5. At L5-S1 there is also small right lateral disc protrusion with narrowing of the right neural foramen. No focal disc herniation is seen in the rest of the lumbar intervertebral discs." Id.

On July 31, 2006, Kinney visited the Geisinger Medical Center complaining of a severe migraine headache and was examined by Yuba R. Acharya, M.D. Tr. 401-402. Kinney's headache was

"mainly lateralized to the right side involving the right eye and occipital region" and she had been having "electric shock like pain in both legs associated with jerky movements of her legs mainly at night." Dr. Acharya's physical examination of Kinney revealed that Kinney was ill and uncomfortable appearing, sobbing most of the time and had mild to moderate spasm of the paralumbar muscles and some limitation of flexion.  Other than those findings the physical examination was essentially normal. Id.  Dr. Acharya's assessment was that Kinney was suffering from an acute migraine headache and backache caused by the intervetebral disc protrusion.  Dr. Acharya was of the opinion that the jerking of the legs was caused by "restless leg syndrome or some psychological factor."  Tr. 402.  He gave her an injection in the clinic of Imitrex for the migraine headache and a script for that medication to be filled.  He also continued her on Methadone and Lortab for her back pain. Id.

On September 18, 2006, Kinney consulted J. Scott Martin, a neurosurgeon, at the Geisinger Medical Center, regarding her back pain to determine whether surgery was an option. Tr. 405. Dr. Martin's physical examination of Kinney revealed essentially normal findings other than she had crutches in the room, a very poor range of forward bending, and a rash over her anterior thigh. He stated in his report of the examination that "[h]er sensory

examination is probably satisfactory although it is somewhat chaotic at times and variable. . . Her MRI shows the fractured L2 with some angulation. At 4-5 and 5-1 there are some minimal disk problems but certainly nothing surgical. . . I see nothing that can be surgically corrected from a neurosurgical standpoint, and I do not recommend any surgery." Id.

On November 24, 2006, Kinney had an appointment at Geisinger Medical Center with Dr. Salgado Campo. Tr. 408. The report of that appointment states in part as follows: "[Prior medical history] remarkable for narcotic dependent chronic pain secondary to traumatic vertebral fractures, as well as restless leg syndrome and [history of] migraines who comes today for yearly check up. Offers no major complaints." The physical examination of Kinney revealed essentially normal findings other than a slightly elevated blood pressure and a positive straight leg raising test on the right lower extremity at 30 degrees. Kinney weighed 157 pounds. Kinney was walking with crutches. Dr. Salgado Campo's assessment was that Kinney was suffering from chronic pain syndrome. He noted that Kinney was taking Methadone and Lortab for the pain. Tr. 408.

On June 22, 2007, Kinney had an appointment with Dr. Salgado Campo. Tr. 414. At this appointment Kinney weighed 152 pounds. Id. Kinney had a positive straight leg raising test on

the right and was walking with crutches. Id. Kinney was diagnosed with chronic pain syndrome and prescribed the drugs Methadone, Lortab and Imitrex. Id.

The reports of the July 12 and October 31, 2006, and the September 25, 2007, appointments with Dr. Ahmed where Kinney received steroid injections indicated that Kinney's history and physical were the "same as done on 1/16/2006."[32] Tr. 399, 406 and 415.

On January 9, 2008, a physical performed by Dr. Ahmed's physician's assistant revealed that Kinney had a positive straight leg raising test "right greater than left." Tr. 419.

On January 16, 2008, Kinney had an appointment at the Geisinger Medical Center for bilateral pulse radiofrequency

---

32. Dr. Ahmed used the abbreviation "H & P" for history and physical.

neuroplasty.  Tr. 423-425.[33]   The report of this procedure states

in pertinent part as follows:

>   This is a 43 year old . . . female with long standing
>   history of axial lumbar spine or low back pain
>   (Lumbago).  The patient underwent a series of lumbar
>   facet medial branch injections under fluoro. In our
>   pain clinic female had good but short term relief with
>   these blocks. Consequently, the patient was offered
>   this pulse radifrequency (sic) neuroplasty procedure
>   in order to provide her a longer duration of pain
>   relief.  Risks, side effects & complications of the
>   procedure including but not limited to nerve damage,
>   nueritis, . . . were explained to the patient.  The
>   patient consented . . . .

Tr. 423.  The report goes on to state that local anesthesia of the

skin and subcutaneous tissue was applied, needles were positioned

bilaterally using flouroscopic imaging at the L2 through L5

levels, and pulse radiofrequency generated a temperature of 42

---

33.  The medical record uses the term "neuroplasty."  However,
the description of the procedure is more in line with the
definition of pulse radiofrequency neurotomy.  The Mayo Clinic
describes this procedure as follows:

>   Radiofrequency neurotomy is a procedure to reduce back
>   and neck pain. It uses heat generated by radio waves to
>   damage specific nerves and temporarily interfere with
>   their ability to transmit pain signals.
>   In radiofrequency neurotomy, the radio waves are
>   delivered to the targeted nerves via needles inserted
>   through the skin above your spine. Imaging scans are
>   used during radiofrequency neurotomy to help the doctor
>   position the needles precisely.

http://www.mayoclinic.com/health/radiofrequency-neurotomy/MY00947
(last visited July 19, 2010).

degrees Celsius at those levels for approximately two minutes.
Tr. 424.

On April 18, 2008, Kinney visited the Geisinger Medical
Center complaining of "prolonged menstrual bleeding." Tr. 426-427.
She was examined by Zhanna V. Siciliano, M.D. The physical
examination was essentially normal other than it was observed that
she had a generalized rash on her legs. Tr.427. The record
reveals that she was still taking Methadone and Lortab for back
pain. Tr. 426-427. She weighed 159 pounds. Tr. 427. Dr.
Siciliano's assessment was as follows: "This is a 44 year old
female with [past medical history] of fracture of L2 with an
angulation, tobacco abuse who presented with prolonged menstrual
bleeding." Id. Dr. Siciliano made a gynecology referral,
continued her prescription for Methadone and Lortab, and counseled
her regarding tobacco cessation. Id.

On May 30, 2008, Kinney had an appointment with Dr.
Siciliano at Geisinger Health System in Danville. Tr. 714-715.
Dr. Siciliano's assessment was that Kinney suffered from "swollen
left leg probably due to venous insufficiency." Tr. 715.

On June 16, 2008, Leo P. Potera, M.D., a state agency
medical consultant reviewed the medical records in this case and
completed a physical residual functional capacity assessment form.
Tr. 435-440. Dr. Potera found that Kinney's primary diagnosis was

a compression fracture at the L2 level and her secondary diagnosis was degenerative disc disease lumbar spine with right leg radiculopathy.[34] Tr. 435.  He concluded that these conditions restricted her ability to engage in work activities to the extent that she could occasionally lift 20 pounds, frequently lift 10 pounds, stand and walk for 2 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday.  He also found that she was limited in lower extremities, occasionally could climb, balance, stoop, kneel, crouch, and crawl, and that she should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazardous activities.  Tr. 437-438.

The final medical record we encounter before Kinney's date last insured is from September 12, 2008, when Kinney had an appointment with Dr. Siciliano at Geisinger Health System in Danville. Tr. 747-748.  Dr. Siciliano's assessment was that Kinney suffered from chronic back pain and prescribed pain medications. Tr. 748.

After the date last insured there are numerous medical records and we will comment on three of them.

---

34.  Radiculopathy is a term to describe the irritation of a nerve resulting in pain and other symptoms such as numbness, tingling, and weakness in the upper or lower extremities. In Kinney's case the cause of lumbar radiculopathy was neural foraminal narrowing at the L5-S1 level. Tr. 411.

On February 9, 2010, Kinney had an appointment with Dr. Ahmed at which she received a steroid injection. Tr. 821. The report of this appointment indicates that Kinney's history and physical was the "same as done on 1/16/2006." Id.

On November 26, 2010, well after the date last insured, Shadia Santos, M.D., completed a functional assessment on behalf of Kinney. Tr. 926. That assessment limited Kinney to less that full-time sedentary employment. Id. However, the assessment does not specifying when Kinney's limitations commenced or how long they were expected to last. Dr. Santos commenced treating Kinney after the date last insured.

Finally, on March 17, 2011, Kinney was evaluated by John Kelsey, Ph.D., a state agency psychologist. Dr. Kelsey concluded that Kinney had marked limitations in her ability to respond appropriately to work pressures in a usual work setting and to changes in a routine work setting. Tr. 645. Again this assessment does not indicate that the limitations commenced prior to Kinney's date last insured. Id.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Kinney had not engaged in substantial gainful work activity from the alleged disability

onset date of November 8, 2003, through her date last insured of
December 31, 2008. Tr. 447.

At step two of the sequential evaluation process, the
administrative law judge found that Kinney had the following
severe impairments: "degenerative disc disease . . . and
degenerative joint disease . . . of the lumbar spine, status post
compression fracture of L2, foraminal stenosis, facet
arthropathy,[35] sacralization,[36] hypertension, status post left
wrist fracture, chronic pain, migraines, substance induced anxiety
disorder, marital problems, adjustment reaction and depressive
disorder."[37] Tr. 447.

---

35.  "The facet joints connect the posterior elements of the
[vertebrae] to one another. Like the bones that form other joints
in the human body, such as the hip, knee or elbow, the articular
surfaces of the facet joints are covered by a layer of smooth
cartilage, surrounded by a strong capsule of ligaments, and
lubricated by synovial fluid. Just like the hip and the knee, the
facet joints can also become arthritic and painful, and they can
be a source of back pain.  The pain and discomfort that is caused
by degeneration and arthritis of this part of the spine is called
facet arthropathy, which simply means a disease or abnormality of
the facet joints." Facet Arthropathy, Back.com,
http://www.back.com/causes-mechanical-facet.html (Last accessed
March 4, 2013).

36.  Sacralization is defined as "anomalous fusion of the fifth
lumbar vertebra to the first segment of the sacrum, so that the
sacrum consists of six segments." Dorland's Illustrated Medical
Dictionary, 1650 (32nd Ed. 2012).

37.  The ALJ did not address Kinney's right lower extremity
radiculopathy.

At step three of the sequential evaluation process the administrative law judge found that Kinney's impairments did not individually or in combination meet or equal a listed impairment. Tr.447-449.

At step four of the sequential evaluation process the administrative law judge found that Kinney through the date last insured could not perform her past relevant light work but had the residual functional capacity to perform a limited range of unskilled, sedentary work.[38] Tr. 449. Specifically, the administrative law judge found that Kinney could perform sedentary work but she had to have a sit/stand option at will or her own direction; she was limited with respect to pushing and pulling with the bilateral lower extremities; she could only occasionally climb, balance, stoop, kneel, crouch and crawl; she could never, climb ladders; she was limited in her ability to reach overhead; she had to avoid vibrations, fumes and hazards; and she was limited to simple, routine tasks and low stress defined as only occasional decision making and only occasional changes in the work setting. Id.

In setting Kinney's residual functional capacity, the ALJ found that Dr. Ahmed from 2006 to 2010 "reported no adverse

_____

38.  Incongruously the ALJ found that Kinney could lift and/or carry 10 pounds frequently and 20 pounds occasionally which are the weight requirements for light work.

objective findings." Tr. 450.  The ALJ also rejected the opinion of Dr. Santos who found that Kinney was limited to less than full-time sedentary work and the marked mental limitations assessed by Dr. Kelsey. Tr. 454.  She further found that Kinney's statements about her alleged symptoms and limitations were not credible to the extent they prevented her from engaging in a limited range of sedentary work. Tr. 450.

At step five, the administrative law judge based on a residual functional capacity of a limited range of sedentary work as described above and the testimony of a vocational expert found that Kinney had the ability to perform unskilled, sedentary work as a ticket taker, garment inspector, and video monitor, and that there were a significant number of such jobs in the regional economy. Tr. 456.

The administrative record in this case is 957 pages in length and we have thoroughly reviewed that record.  Kinney argues, inter alia, that the administrative law judge erred by failing to appropriately evaluate Kinney's credibility.  That argument has merit.

The ALJ based her credibility judgment of Kinney partly on the erroneous finding that Dr. Ahmed did not report any adverse objective medical findings.  The ALJ stated in her decision as follows:

> After careful consideration of the evidence, the
> undersigned finds that the claimant's medically
> determinable impairments could reasonably be
> expected to cause the alleged symptoms; however, the
> claimant's statements concerning the intensity,
> persistence and limiting effects of these symptoms
> are not credible to the extent they are inconsistent
> with the above residual functional capacity
> assessment.
>
> The claimant alleged that she could not sustain work
> because of her back pain, left wrist weakness and
> depression . . . However, objective signs and findings
> on physical examination are not particularly adverse
> and do not support a finding of disabled. . . On
> physical examination, Dr. Ahmed reported no adverse
> objective findings . . . .

Tr. 450. Contrary to the ALJ's assertion of "no adverse objective

findings" Dr. Ahmed on several occasional made such findings.

As stated in our review of the medical evidence on January 16,

2006, Kinney had an appointment with Dr. Ahmed, M.D., at Geisinger

Medical Center, Interventional Pain Center. Tr. 390-392.  Kinney

complained of pain in the distal thoracic, the low back with

radiation to the buttocks and occasional radiation of pain to the

right posterior thigh and calf. Tr. 390.  The physical examination

revealed that Kinney's gait was slow and antalgic, her flexion of

the back was reduced 50 degrees and caused low back pain, her

extension and rotation of the back produced low back pain, she had

a positive bilateral straight leg raising test and a positive

bilateral Patrick's maneuver, and her sacroiliac joint was tender.

Tr. 392.  Moreover, the reports of the July 12 and October 31,

2006, and the September 25, 2007, appointments with Dr. Ahmed where Kinney received steroid injections indicated that Kinney's history and physical were the "same as done on 1/16/2006." Tr. 399, 406 and 415. Consequently, we conclude that the ALJ's credibility judgment is based on a faulty premise.

In addition, there was no attempt by the administrative law judge to obtain an assessment from Kinney's treating physicians regarding Kinney's functional capacity during the relevant time period. The administrative law judge had a responsibility to investigate the facts and develop the arguments both for and against granting benefits. In this case she did not fulfill that responsibility.

Kinney also argued that the testimony of the vocational expert was confusing and inconsistent. Doc. 11, Plaintiff's Brief, p. 17. We agree that the vocational experts testimony does appear to be inconsistent and fails to support the conclusion that Kinney can engage in the jobs identified based on the residual functional capacity set forth in the ALJ's decision. All of the jobs identified by the ALJ were sedentary positions. Tr. 507. The ALJ in her decision limited Kinney to jobs that required a "sit/stand option at will or at her own direction" and a limitation on pushing and pulling with the bilateral lower

extremities. Tr. 449. The vocational expert was asked the following series of questions by the ALJ:

> Q. Now, assume if you will, we are dealing with an individual of the same age, same education and same past work experience as the claimant. Assume further that this individual retains the capacity to perform sedentary work. However, that sedentary work is limited. There would be a bilateral lower extremity push/pull limitation . . . There would be a bilateral overhead reach limitation . . . Can such an individual perform any of the same past relevant work as the claimant?
>
> A. [No]
>
> Q. Could such an individual perform any other job in the regional or national economy?
>
> A. Within that hypothetical outline, I think the video monitor position previously cited would remain in play, but the ticket taker and garment inspector would be compromised by the bilateral push/pull limitation.
>
> Q. The lower extremity push/pull limitation?
>
> A. Oh, it was a lower, I thought – ?
>
> Q. I'm sorry. I didn't way upper/lower. Lower extremity push/pull, bilateral lower extremity.
>
> A. Within that outline your Honor, I think the three previous cited jobs would remain viable.
>
> *   *   *   *   *   *   *   *   *   *   *
>
> Q. Now, I've taken that last hypothetical, and clarifying that it is a bilateral lower extremity push/pull limitation. If I added the following restriction a sit/stand option at the will or direction of the individual, could such individual perform the past relevant work of the claimant?
>
> A. [No]

> Q. Could such an individual perform any other job
> in the regional or national economy?
>
> A. <u>Within that hypothetical outline, your Honor,
> my vocational opinion would be that an individual
> would be precluded from sustaining gainful
> employment as they would not be able to maintain
> a persistence in work days.</u>

Tr. 508-510 (emphasis added). Based on the residual functional
capacity set by the ALJ in her decision and these answers of the
vocational expert, we have to conclude that Kinney could not
perform the jobs identified by the ALJ in her decision.
Consequently, we cannot conclude that he vocational expert's
testimony is substantial evidence supporting the ALJ's decision.

Our review of the administrative record reveals that the
decision of the Commissioner is not supported by substantial
evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g)
vacate the decision of the Commissioner and remand the case to the
Commissioner for further proceedings.

An appropriate order will be entered.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

Dated: March 8, 2013